**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KRISTIN BURNS,** | |
| *Plaintiff,* | **Case No. 2:23-cv-01810-JDW** |
| v. | |
| **DENIS MCDONOUGH,** Secretary, Department of Veterans Affairs, | |
| *Defendant.* | |
| | |
| **KRISTEN RUELL,** | |
| *Plaintiff,* | **Case No. 2:23-cv-02487-JDW** |
| v. | |
| **DENIS MCDONOUGH,** Secretary, Department of Veterans Affairs, | |
| *Defendant.* | |

## <u>MEMORANDUM</u>

Title VII "does not mandate a happy workplace." *Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). Discrimination and poor management are both bad for the workplace, but only one of them is illegal. Kristin Burns and Kristen Ruell worked for a difficult boss who assigned them work above their paygrade, failed to support them, and berated them in front of their colleagues. But there's no evidence that their supervisor treated them this way because of their race or sex. To the contrary, she seems to have

treated many of her subordinates that way. However, after Mss. Burns and Ruell complained about this treatment—which they perceived to be discriminatory—the U.S. Department of Veterans Affairs revoked its offer to transfer them to a new position. This evidence creates a fact question about whether the VA retaliated against them for making a complaint of discrimination, so I will deny Secretary Denis McDonough's motion for summary judgment as to that claim. But absent evidence of intentional discrimination, I will grant summary judgment as to the claims for disparate treatment and hostile work environment.

## I.   BACKGROUND

### A.   Employment At The VA And Settlement Agreements

Mss. Burns and Ruell are White women who work for the VA. Previously, both women worked in-person at the Philadelphia Regional Office ("Philadelphia RO") of the Veterans Benefits Administration ("VBA").

In 2012, Ms. Ruell discovered that a computer glitch caused duplicate payments, overpayments, or both to certain veterans and their dependents. She also discovered that hard copy claims that came through the mail and data-entry errors caused some veterans not to receive any benefit payments at all. Ms. Ruell reported these issues and testified about them before Congress in 2014 and 2015. After reporting these errors, Ms. Ruell claims that individuals in the Philadelphia RO retaliated against her, so she filed Equal

Employment Opportunity ("EEO") and Merit System Protections Board ("MSPB") complaints with the VA in 2014.

In September 2015, the VA Undersecretary for Benefits, Allison Hickey, arranged for Ms. Ruell to begin working on a remote detail to a VA sub-unit called the "MyVA Task Force," which operated out of VA's Central Office ("VACO") in Washington, D.C. As a result, Ms. Ruell no longer had to work for the Philadelphia RO, where she had been subject to retaliation.

 In May 2016, Ms. Ruell entered into a Settlement Agreement with the VA to resolve her pending EEO and MSPB claims. Her Settlement Agreement provides that her "detail to the MyVA team will be extended from September 7, 2016 until the end of the MyVA charter, December 10, 2016" and that after December 10, 2016, the VA would "not object to extensions for [Ms. Ruell's] detail or will not object or be opposed to a new detail outside of MyVA unless MyVA or VACO declines further extensions/opportunities to [her]." (ECF No. 35-11 at ¶ 4.c.[1])

In 2016, Ms. Burns started a remote detail with the MyVA Task Force.[2] Like Ms. Ruell, Ms. Burns did not report to the Philadelphia RO while working on this detail. In 2017, Ms. Burns filed an MSPB complaint against the VBA for claims of discrimination

---

[1]	For ease of reference, I refer to the docket entries as they appear on the *Burns* docket. The same documents appear on the *Ruell* docket.

[2]	In 2017, the MyVA Task Force became the "Modernization Office" under VA's Office of Enterprise Integration ("OEI"). In May 2020, Modernization Office became the Enterprise Program Integration Office ("EPIO").

under the Uniformed Services and Employment and Reemployment Rights Act ("USERRA"). Ms. Burns alleged that "she was experiencing hostility (to include non-selection of jobs in the workplace) after reporting wrongdoing towards Veterans by the Philadelphia's HR Chief and Selecting Official." (ECF No. 35-12 at p. 2 of 68.) In June 2018, Ms. Burns entered into a Settlement Agreement with the VA to resolve her pending MSPB complaint. Ms. Burns's Settlement Agreement includes a nearly identical provision to Ms. Ruell's regarding her current detail and any details going forward. (*See* ECF No. 41 at Section I.g.D.)

### B.    Details To MyVA Task Force/EPIO

When VA detailed Mss. Burns and Ruell to MyVA Task Force/EPIO, they were "smoke-jumpers"—meaning that they worked on a variety of different projects, rather than one full-time position dedicated to one specific project. As a result, their day-to-day assignments varied. At the end of each fiscal year, the VA renewed Mss. Burns's and Ruell's details with MyVA Task Force/EPIO, through fiscal year 2020, which ended on September 30, 2020. In August of each year, Mss. Burns and Ruell would ask if there was enough work for them to remain on the detail another year, and there was until the end of fiscal year 2020. According to Ms. Ruell, if there wasn't going to be enough work, then they "wanted to find another opportunity"—*i.e.* another detail—to avoid having to go back to the Philadelphia RO. (ECF No. 35-10 at 101:8-19.)

4

In May 2020, Meredith Bedenbaugh-Thomas ("MBT"), a Black woman, joined OEI to lead an effort to revamp the VA's Electronic Health Record Modernization ("EHRM") system. One component of the EHRM project was to create an internal dashboard. A VA employee named Jason Carley worked on the dashboard project until he moved into another role in July 2020. After he left, Mss. Burns and Ruell started working to support the dashboard project in mid-to-late July 2020. However, no one, including MBT, gave Mss. Burns or Ruell any direction about what they were supposed to be doing to support the dashboard project or what their role was with respect to that assignment. Neither Ms. Burns nor Ms. Ruell had the skillset to create an internal dashboard, and they felt as though they were being set up to fail.

On August 6, 2020, Mss. Burns and Ruell had their first direct meeting with MBT. During that meeting, MBT wanted to know how Mss. Burns and Ruell ended-up on their details to OEI. They explained that they were "there due to a settlement agreement due to prior EEO activity." (ECF No. 35-9 at 56:5-10.) During that meeting, the three women discussed the dashboard project, and Mss. Burns and Ruell made MBT aware that they did not feel they had the necessary training or skillset to work on the dashboard project. They also contend that the dashboard work was above their paygrade. MBT told them that she would take over as lead of the dashboard project and they could help her with it, in addition working on the other projects they had been working on within OEI.

During this conversation, Mss. Burns and Ruell mentioned that their details were coming to an end, and they asked MBT if OEI was planning to extend their details, as it had done before. MBT said yes and that she would figure out how to get them extended. Ms. Ruell left that meeting thinking that their details with OEI would be extended like before.

After that meeting, Mss. Burns and Ruell continued to struggle with the dashboard project because MBT "didn't help like she said she was going to help." (ECF No. 35-10 at 140:22-23.) Instead, MBT called out Mss. Burns and Ruell in front of their coworkers during team meetings and berated them for not completing the project. Things came to a head during a team meeting on August 17, 2020, when MBT asked Mss. Burns and Ruell if they had "performance standards," humiliating them in front of the group. (*Id.* at 141:8.) In another call, MBT told Mss. Burns and Ruell that they had to complete a Findings and Analysis on a short time frame, and she berated them for not knowing how to do it. Again, Mss. Burns and Ruell felt embarrassed in front of colleagues who were also on the call.

Given the treatment from MBT, neither Ms. Burns nor Mr. Ruell wanted to continue working for her, but she had agreed to extend them another year. So, the next day—August 18, 2020—Mss. Burns and Ruell called a different supervisor, Larry Fink, and explained what happened with MBT. They complained that MBT had subjected them to a hostile work environment and that she had yelled and berated them in front of colleagues. They did not tell Mr. Fink that they believed MBT was treating them this way because of

their race or sex. Mr. Fink advised them to talk to Jennifer Jessup in HR about the situation. He also told them that other employees had complained about MBT.[3] During the call, Mss. Burns and Ruell asked Mr. Fink if he had work for them and if they could come work for him instead. He told them he was starting a big requirements project and that he could use them on it. He advised his boss, Mike Frueh, that they were available.

Following their conversation with Mr. Fink, Mss. Burns and Ruell contacted Ms. Jessup and made the same complaints about MBT. Again, they referenced a hostile work environment, but they did not allege that MBT was treating them differently because of their race or sex. When asked why she believed MBT's treatment was based on race, Ms. Burns testified that she "felt like it was a racial discrimination, because I'm white and [MBT] is black." (ECF No. 35-9 at 64:15-18.) Admittedly, Ms. Burns did not suspect sex discrimination until after she complained about MBT. (*See* ECF No. 35-9 at 64:18-22 ("And then after August 18th, I learned that men had complained about [HWE], ... so then I realized gender was an issue."); ECF No. 35-9 at 71:10-18 (testifying that she "began to feel it was gender" discrimination "[s]ometime after August 18th").)

After speaking with Mr. Fink and Ms. Jessup, Mss. Burns and Ruell spoke with MBT. They advised her that they did not want to continue working on the dashboard project and that Mr. Fink had another project for them to work on. MBT "said it was fine, and that

---

[3]    There is no evidence about whether other VA employees complained about discrimination by MBT.

she would … get the paperwork done." (ECF No. 35-10 at 144:3-5.) Thus, as of August 18, 2020, Mss. Burns and Ruell planned to work with Mr. Fink going forward, and MBT "agreed." (*Id.* at 144:7.)

After Mss. Burns and Ruell stopped working on the dashboard project, they were excluded from EPIO team meetings and communications. The record does not indicate who left them off the invitations and emails, but they contend that this started as soon as they complained about MBT. For example, the Office of Resolution Management, Diversity & Inclusion ("ORMDI") scheduled a mediation session with OEI on September 28, 2020, but did not invite Mss. Burns or Ruell. However, the meeting facilitator sent them invitations once Ms. Ruell advised him that they were still part of the EPIO team until their details ended on September 30, 2020. At the start of the meeting—which was virtual— Ms. Jessup removed Mss. Burns and Ruell, but the facilitator let them back in. They were embarrassed but participated in most of the session. Other employees, like Joe Salvatore (a White male) and Saddia Walton (a Black woman), also complained about MBT, but they continued to be included in emails and team meetings, like the ORMDI session.

Shortly after August 18, 2020, Ms. Jessup and MBT reached out to OEI's Chief of Staff, Shana Love-Holmon, about Mss. Burns and Ruell going to work on the requirements project with Mr. Fink. Ms. Love-Holmon contacted Mr. Fink and Mr. Frueh about these details, and "they identified they did not actually have full-time work or they didn't have a statement of duty or anything that we would be able to detail them to." (ECF No. 35-8

at 36:11-14.) Mr. Frueh testified that his boss, Dat Tran, told him that he and Ms. Love-Holmon were aware that Mss. Burns's and Ruell's details would be ending at the end of September 2020, and he asked Mr. Frueh to stand down on offering the requirements project to them. Mr. Frueh conveyed this information to Mr. Fink, and Mr. Fink advised Mss. Burns and Ruell that they would not be working on the requirements project and that he was sorry it didn't work out. Mr. Frueh did not know why Mr. Tran directed him to stand down.

On September 1, 2020, Ms. Jessup forwarded an opening to Mss. Burns and Ruell for a detail on the requirements project and encouraged them to apply. However, it was only one full-time position, and neither one of them applied for it. Ms. Love-Holmon then advised them that none of the other special projects they had worked on had "documented full time employee requirement gaps as identified by VA leadership in those organizations that support an official identified need in OEI." (ECF No. 35-20.) Thus, without another detail opportunity, Mss. Burns and Ruell would have to return to working for the Philadelphia RO once their OEI details ended as of September 30, 2020.

In September 2020, Ms. Ruell reached out to an acquaintance, Peter Rizzo, to find another detail opportunity. Mr. Rizzo, a Program Manager in VA's Construction and Facilities Management ("CFM"), told Ms. Ruell that CFM was trying to find employees to work on a project and that he thought Ms. Ruell would be perfect for it. Mr. Rizzo put Mss. Burns and Ruell in touch with Alan Trow, a supervisor and Director of Quality

Assurance Service at CFM, so that they could discuss a potential detail. Mr. Trow needed workers and drafted memoranda of understanding for both Mss. Burns and Ruell to work for him at CFM for a year once their OEI details ended. He also completed paperwork and sent it to the Philadelphia RO. However, Mr. Trow never spoke to CFM HR or his own supervisor about the details. According to Mr. Rizzo, "CFM simply has no formal policies or procedures in place governing employee details" and "it has been CFM HR's practice to make up the rules as they go[.]" (ECF No. 36-5.)

On October 6, 2020, Michael Brown, Director of HR at CFM, received a call from Lucia Alencherry from the VA's Office of General Counsel. During that call, Ms. Alencherry inquired about the proposed details for Mss. Burns and Ruell and asked if they had been created "legally." (ECF No. 35-25 at 31:6-8.) Mr. Brown had no idea about the details, but upon investigation, he learned about the MOUs from Mr. Trow. He advised Mr. Trow that he could not offer the details to Mss. Burns and Ruell because he did not follow the proper procedures with HR. Mr. Brown suggested that Mr. Trow reach out to his HR liaison, Kimberly Woods, about what needed to be done to put the details in place. Ms. Woods advised that "official documentation/info" would be between CFM and the Philadelphia RO and that there "really isn't anything on [HR's] end that has to be done." (ECF No. 36-15.) Mr. Brown disagreed. According to him, there must be vacancy in CFM to create a detail, and then an HR specialist reviews the applicant's resume and verifies that she has the qualifications to satisfy the job duties. As a result, he advised Mr. Trow to rescind the

offers he made to Mss. Burns and Ruell. With no available detail, Mss. Burns and Ruell had to report to the Philadelphia RO. They worked remotely until April 2021, at which time they were placed in new remote, permanent positions with the Office of Outreach Transition and Economic Development ("OTED").

### C.    Procedural History

On September 15, 2020, Mss. Burns and Ruell filed complaints with ORMDI. They also filed EEO charges of discrimination on September 24, 2020. On October 2, 2020, while their complaints were pending, Ms. Burns's Counsel wrote to Ms. Alencherry and argued that the VA's actions to deny Mss. Burns's and Ruell's choice of details violated their respective Settlement Agreements and was retaliatory.

After completing the administrative process, Mss. Burns and Ruell filed suit in this Court. Represented by Counsel, Ms. Burns filed suit on May 11, 2023. In her operative Second Amended Complaint, she asserts claims against the VA, via Secretary McDonough, for violations of Title VII of the Civil Rights Act of 1964, including discrimination based on race, color, and gender and retaliation.

On June 27, 2023, Ms. Ruell filed a *pro se* Complaint, alleging the same claims, as well as a claim of hostile work environment. I dismissed that claim pursuant to Federal Rule of Civil Procedure 12(b)(6) but permitted Ms. Ruell to proceed with a claim of a retaliatory hostile work environment. I also granted her leave to try and replead her hostile work environment claim via an amendment, and Ms. Ruell filed her Second Amended

Complaint on October 31, 2023, asserting such a claim. Secretary McDonough did not move to dismiss it.

Given the overlapping facts and claims at issue in this case, I directed the Parties to coordinate their discovery efforts. Since then, Secretary McDonough moved for summary judgment on all of Mss. Burns's and Ruell's claims, and the motions are ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead, [s]he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B). If she fails to make this showing, then the court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3).

### III.   ANALYSIS

#### A.   Disparate Treatment

Mss. Burns' and Ruell's claims of discrimination based on their race and sex are subject to the familiar *McDonnell Douglas* burden-shifting framework. Under that framework, they must first establish a *prima facie* case of discrimination by showing that (1) they are members of a protected class; (2) they are qualified for the positions they sought to attain or retain; (3) they suffered an adverse employment action; and (4) "the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Qin v. Vertex, Inc.*, 100 F.4th 458, 473 (3d Cir. 2024) (quotation omitted). "To establish a *prima facie* case at summary judgment, the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] *prima facie* case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (same). Thus, "[i]f a plaintiff fails to raise a genuine dispute of material fact as to **any** of the elements of the *prima facie* case, she has not met her initial burden, and summary judgment is properly granted for the defendant." *Id.* (emphasis added).

Mss. Burns and Ruell cannot prevail on their disparate treatment claims because they cannot establish a *prima facie* case of discrimination without evidence that the alleged adverse actions—the non-renewal of their OEI details and the withdrawal of an offer to work in CFM—occurred under circumstances that could give rise to an inference of intentional discrimination. There is no direct evidence in the record to support such an

inference, such as statements by MBT demonstrating her racial or sex-based animus. To be clear, Ms. Burns's personal belief that MBT discriminated against her based on race because she is white and MBT is black is not evidence that creates an inference of discrimination. *See May v. PNC Bank*, 434 F. Supp. 3d 284, 300 (E.D. Pa. 2020); *Schwartz v. Nicomatic, Inc.*, No. 17-cv-2516, 2017 WL 6606888, at *8 (E.D. Pa. Dec. 27, 2017).

The absence of direct evidence doesn't have to be the end of the story, though. Plaintiffs alleging disparate treatment discrimination can satisfy the last element of the *prima facie* case with evidence that their employer treated similarly-situated persons outside the protected class—*i.e.* comparators—more favorably. *See Qin*, 100 F.4th at 474. To create an inference of intentional discrimination, "comparator employees need not be identical but must be similarly situated in 'all material respects.'" *Id.* (quotation omitted). In conducting that inquiry, a judge looks to "[f]actors that are relevant include whether the employees dealt with the same supervisor, were subject to the same standards, and shared similar job responsibilities." *Id.* at 474 (citations omitted).

Mss. Burns and Ruell haven't told me anything about the two comparators on whom they rely, let alone explain how they are similarly situated. For their sex discrimination claims, Mss. Burns and Ruell point to Joseph Salvatore (male) and contend that he also complained about MBT but was not removed from the EPIO team. Instead, they allege that he moved to a Communications role. For racial discrimination, Mss. Burns and Ruell identify Saddia Walton (Black) and contend that she also remained on the EPIO

14

team after complaining about MBT. But these barebone assertions are insufficient to demonstrate that either individual is a valid comparator. I don't know anything about Mr. Salvatore or Ms. Walton's job responsibilities, their immediate supervisors, which GS levels they occupied, their efforts to secure alternate details (if any), or the nature of their complaints about MBT. Without this evidence, no reasonable jury could conclude that these two individuals are similarly situated to Mss. Burns and Ruell in all material respects. Mss. Burns and Ruell also contend that they "were asked to work a job for which they weren't qualified for and then ridiculed for not knowing how to perform this job" while "[m]ale employees and Black employees were not forced to work above their pay grade." (ECF No. 37-1 at 14.) But there is no evidence in the record that speaks to this issue, and Mss. Burns and Ruell do not identify any other potential comparators to support this assertion.

The limited evidence about Ms. Walton and Mr. Salvatore suggests they are not similarly situated. For example, there is a passing reference in the record that Ms. Walton worked in HR as Jennifer Jessup's assistant, and it appears that Mr. Salvatore was Ms. Ruell's supervisor at some point in time. (*See* ECF No. 36-3 at 000068, 000071.) These different positions doom Mss. Burns and Ruell's proffered comparator evidence because "[a]n employee who holds a different job title or works in a different department is not similarly situated." *Qin*, 100 F.4th at 474. Because these two individuals are not valid comparators, Mss. Burns and Ruell cannot meet their burden of establishing an inference

of intentional discrimination based on race or sex, an essential element of a *prima facie* case. Thus, Secretary McDonough is entitled to summary judgment on this claim.

**B.    Retaliation**

**1.    *Prima facie* case**

Courts review retaliation claims using the same three-step burden shifting framework under *McDonnell Douglas*. Thus, to prevail on these claims, Plaintiffs must first establish a *prima facie* case by showing: (1) they engaged in protected employee activity; "(2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between [their] protected activity and the employer's adverse action." *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022) (quotation omitted). Mss. Burns and Ruell have come forward with enough evidence to satisfy these elements.

As an initial matter, however, I agree with Secretary McDonough that Mss. Burns and Ruell did not engage in protected activity until they filed with the EEO in September 2020. In the Title VII context, "protected 'opposition' activity" refers to formal and informal "protests of discriminatory employment practices[.]" *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015) (quotation omitted). When Mss. Burns and Ruell advised MBT during their call on August 6, 2020, that they had filed EEO complaints against the VA years earlier, they were not engaging in protected activity because they were not protesting, opposing, or complaining about current (or even past) discrimination. Instead,

they simply advised MBT about their prior filings when she asked about how they ended up detailed to OEI.

In addition, Mss. Burns and Ruell did not engage in protected activity on August 18, 2020, when they complained to Mr. Fink and Ms. Jessup about working for MBT because they did not attribute MBT's behavior to discrimination based on race or sex. Title VII is "not intended to establish general standards for conduct of employers in dealing with employees." *Daniels*, 776 F.3d at 195; *see also Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995). For a complaint to constitute protected activity under Title VII, plaintiffs "must allege that the opposition was to discrimination based on a protected category, such as age or race." *Daniels*, 776 F.3d at 193 (citations omitted). But Mss. Burns and Ruell both admit that neither one of them mentioned race or sex discrimination when making their complaints about MBT to Mr. Fink and Ms. Jessup.

While they used the term "hostile work environment," that phrase—on its own—is not magic language that cloaks them with the protection of Title VII if it contains "no reference whatsoever to race or any other protected characteristic." *Massiah v. Tennessee State Univ.*, No. 21-cv-66, 2022 WL 2911804, at *7 (M.D. Tenn. July 22, 2022). Instead, I must "look to the message ... conveyed [by [their] conduct] rather than the means of conveyance." *Daniels*, 776 F.3d at 193 (quotation omitted). Mss. Burns and Ruell complained to Mr. Fink and Ms. Jessup that MBT had: yelled at them in front of coworkers during a team meeting; berated them about a Findings and Analysis; and assigned them

projects that were above their paygrade, which they did not know how to complete. Nothing about the context of these complaints suggests that Mss. Burns or Ruell were complaining about race or sex discrimination when they spoke with Mr. Fink and Ms. Jessup on August 18, 2020. The mere fact that MBT is a different race than Mss. Burns and Ruell is not sufficient. And Mss. Burns's[4] and Ruell's subjective beliefs that they were complaining about race or sex discrimination does not turn those complaints into protected conduct if a reasonable listener wouldn't have understood them that way. *See Daniels*, 776 F.3d at 194.

However, there is no dispute that Mss. Burns and Ruell engaged in protected activity when they filed an EEO charge of discrimination on September 24, 2020. They also engaged in protected activity when they filed ORMDI complaints on September 15, 2020. They have satisfied the first element of their *prima facie* case.

As for the second prong of their claim, a reasonable employee could have found that being sent back to work at the Philadelphia RO was materially adverse, given the particular facts of this case. Indeed, Mss. Burns and Ms. Ruell had filed previous complaints against that office and had a settlement agreement in place that was designed to keep them from having to work there, to the extent feasible. A reasonable jury could conclude that sending

---

4       Ms. Burns did not believe she was complaining about sex discrimination when she spoke with Mr. Fink and Ms. Jessup. During her deposition, she testified that she did not begin to suspect sex discrimination until *after* she and Ms. Ruell complained on August 18, 2020. (*See* ECF No. 35-9 at 64:18-22, 71:10-18.)

an employee back to a working environment about which they had filed whistleblower and internal complaints "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

It does not matter that their pay and benefits remained the same. Indeed, "the significance of any given act of retaliation will often depend upon the particular circumstances[,]" *id.* at 69, and "'[c]ontext matters' such that 'an act that would be immaterial in some situations is material in others.'" *Daniels*, 776 F.3d at 196 (quotation omitted). In this case, on these facts, it matters that Mss. Burns and Ruell had prior negative experiences in the Philadelphia RO, complained about that office, and then settled their complaints in a way that was designed to keep them from having to report to that office in the future. In the face of that history, sending them back to work for that office could dissuade a reasonable employee from making a complaint, even if they knew that their pay and benefits would remain the same.

Finally, Mss. Burns and Ruell satisfy the causation prong at this stage of the proceedings. They filed charges of discrimination on September 15, 2020 and September 24, 2020. Less than a month later, Mr. Trow rescinded his offer to have them work in CFM, meaning they would have to report to the Philadelphia RO.[5] "This timing is well within the three-month range to be 'unusually suggestive of retaliatory motive.'" *Qin*, 100 F.4th at 477

---

[5]     The VA's decision not to extend Mss. Burns's and Ruell's OEI details cannot satisfy the adverse action element because the VA made that decision at some point in August of 2020—*before* Mss. Burns and Ruell filed their ORMDI and EEO complaints.

(quotation omitted). Thus, they have satisfied the causation prong for purposes of summary judgment.

### 2.      Legitimate nondiscriminatory reason

Having established a *prima facie* case, the burden shifts to Secretary McDonough to "produc[e] evidence that 'present[s] a legitimate, non-retaliatory reason for having taken the adverse action.'" *Canada*, 49 F.4th at 346 (quotation omitted). If he meets this burden, then the burden "shifts 'back to the plaintiff[s] to demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id.* (same). Secretary McDonough has come forward with a legitimate, non-retaliatory reason for having rescinded Mss. Burns's and Ruell's offers to work at CFM and sending them back to the Philadelphia RO: there were no open full-time positions for them within CFM, and Mr. Trow did not follow HR's procedures for creating the details. The burden therefore shifts back to Mss. Burns and Ruell.

### 3.      Pretext

To overcome summary judgment at the third step, Mss. Burns and Ruell "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Canada*, 49 F.4th at 347 (quotation omitted). They can meet this burden by "'painting the [employer's articulated reasons] as weak, implausible, contradictory, or

incoherent' [or] 'by showing that the employer in the past had subjected [them] to unlawful discriminatory treatment, [or] that the employer treated other, similarly situated persons not of [their] protected class more favorably.'" *Id.* (same). However, they cannot prevail by "show[ing] that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

Mss. Burns and Ruell have come forward with enough evidence to disbelieve the VA's reasons for refusing to place them in details in CFM, and they have also come forward with enough evidence that could lead a reasonable jury to conclude that retaliation motivated that decision. After receiving an email from Mr. Trow regarding his proposal to detail Mss. Burns and Ruell to work for him in CFM, Mr. Trow's HR liaison—Ms. Woods—advised him that "[t]he official documentation/info is between you and their current office. There really isn't anything on [HR's] end that has to be done." (ECF No. 36-15.) Ms. Woods's reply that HR did not need to do anything further undermines the VA's explanation that Mr. Trow failed to follow HR procedures in creating the details for Mss. Burns and Ruell. Similarly, Mr. Rizzo's email to Ms. Ruell that "CFM simply has no formal policies or procedures in place governing employee details" and his observation that "it has been CFM HR's practice to make up the rules as they go," also casts doubt on the VA's explanation. (ECF No. 36-5.)

Mss. Burns and Ruell have also come forward with evidence that could lead a reasonable jury to conclude that retaliation was the real reason behind the VA's decision to rescind the CFM offers. In addition to the unusually suggestive temporal proximity between Mss. Burns and Ruell's protected activity and rescission of Mr. Trow's offer, there is additional evidence that calls the VA's motives into question.

On October 2, 2020, Ms. Burns's Counsel wrote a letter on behalf of Mss. Burns and Ruell to Ms. Alencherry in the VA's Office of General Counsel, arguing that the VA's "actions to deny Ruell and Burns their choice of detail is retaliatory." (ECF No. 36-6.) Four days later, Ms. Alencherry called Mr. Brown and asked about the new details for Mss. Burns and Ruell. Mr. Brown was unaware of any details before receiving Ms. Alencherry's call. However, once Mr. Brown confirmed that new details were in place, Ms. Alencherry asked him if the details were "put in … legally and the way they should have been as a detail." (ECF No. 35-25 at 31:6-8.) Following that call, Mr. Brown determined that Mr. Trow had not followed the proper procedures to create the details and that they were invalid as a result.

The incredibly short time-frame—the span of four days—between Counsel's letter to Ms. Alencherry and her call to Mr. Brown (who had been unaware of the details) and his subsequent investigation into the CFM details is unduly suggestive of a retaliatory motive. Given all of this, Mss. Burns and Ruell have come forward with sufficient evidence to create a genuine dispute of fact as to whether Secretary McDonough's reason for denying them

CFM details was pretext for unlawful retaliation. Thus, the VA is not entitled to summary judgment on this claim.

### C.    Ms. Ruell's Claims

When I dismissed Ms. Ruell's hostile work environment claim, I granted her to leave to file an amended complaint if she intended to revive that claim. Ms. Ruell took me up on that offer and filed a Second Amended Complaint, reasserting that claim. Secretary McDonough did not seek to dismiss the reasserted claim, so it remains live in the case. Though Secretary McDonough moved for summary judgment on this claim as if it were a retaliatory hostile work environment claim—which is somewhat different—Ms. Ruell addressed the merits of a pure hostile work environment claim, so I will address both.

#### 1.    Hostile work environment

To establish a hostile work environment claim, Ms. Ruell must prove (1) she suffered intentional discrimination because of her race or sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) there was *respondeat superior* liability. *See Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023). At a minimum, Ms. Ruell's hostile work environment claim fails for the same reason her disparate treatment claim fails: she has not come forward with any evidence that she suffered intentional discrimination because of her race or sex. "Under Title VII, even if there is severe or pervasive behavior, a plaintiff cannot succeed if the reason for the

harassment is not based upon race [or sex]." *Brown v. Sch. Dist. of Philadelphia*, No. 17-cv-2653, 2018 WL 4489646, at *7 (E.D. Pa. Sept. 19, 2018). As I've already explained, there's no evidence, other than Ms. Ruell's subjective belief, that she was treated the way she was due to her race or gender. Thus, Secretary McDonough is entitled to summary judgment on Ms. Ruell's hostile work environment claim.

### 2.   Retaliatory Hostile Work Environment

The elements of a retaliatory hostile work environment are the same as a claim for retaliation, except that the adverse action is the hostile work environment. To the extent Ms. Ruell intended to pursue a retaliatory hostile work environment, she cannot overcome summary judgment on this claim either because she has not come forward with any evidence that she was subjected to a hostile work environment after she engaged in protected activity.

Ms. Ruell did not engage in protected activity when she advised MBT that she had filed a prior EEO complaint against the VA nor when she complained about a hostile work environment to Mr. Fink and Ms. Jessup. Thus, to prevail on her claim of a retaliatory hostile work environment, Ms. Ruell must demonstrate that the VA subjected her to a hostile work environment after or contemporaneous with when she filed her charges of discrimination in September 2020. But Ms. Ruell cannot make the requisite showing.

*First*, much of the evidence that Ms. Ruell relies on to support her claim of a hostile work environment pre-dates her protected activity. To the extent MBT mistreated her by

berating and belittling her and assigning her work above her paygrade, that all happened *before* she filed her EEO complaint. In fact, that alleged conduct prompted Ms. Ruell to file her complaint. The same is true of her removal from team meetings and emails. Again, Ms. Ruell claims that she was effectively removed from the team immediately after she complained about MBT on August 18, 2020—weeks before she filed with the EEO.

*Second*, the alleged conduct that occurred after Ms. Ruell engaged in protected activity does not rise to the level of a hostile work environment. "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nitkin*, 67 F.4th at 570 (quotation omitted). The fact that OEI did not invite Ms. Ruell to the virtual facilitation session on September 28, 2020, was an isolated incident, and no reasonable jury would conclude that failing to invite Ms. Ruell to the meeting or briefly removing her from the start of the meeting created a hostile work environment for her. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). That is because Ms. Ruell ultimately participated in "most of" the meeting after advising the facilitator that she was still on the OEI team. (ECF No. 35-10 at 224:3.) This one-off, "petty slight" is a far cry from the type of conduct necessary to create a hostile work environment. *Daniels*, 776 F.3d at 196 (quotation omitted). And because Ms. Ruell's detail was ending two days later, it could not have

created a hostile work environment to exclude her from a team meeting that would have no relevance to her going forward.

*Third*, while a jury could conclude that sending Ms. Ruell back to the Philadelphia RO was materially adverse for purposes of her retaliation claim, there is no evidence in the record Ms. Ruell suffered from abusive or discriminatory conduct once she resumed working for the Philadelphia RO. Simply put, Ms. Ruell has not come forward with any evidence about the conditions of her employment or what her work environment was like after her detail in OEI ended. As such, she cannot prevail on a claim of a retaliatory hostile work environment, so Secretary McDonough is entitled to summary judgment on this claim as well.

## IV.    CONCLUSION

No doubt, Mss. Burns and Ruell found it difficult to work for their boss at the VA, and she did not always treat them (or others) with professional courtesy or respect. But that isn't illegal, and Mss. Burns and Ruell haven't come forward with any evidence that she treated them poorly because of their race or sex. There also isn't any evidence that Ms. Ruell experienced a hostile work environment because of these protected characteristics. However, there is enough evidence to create a question as to whether the VA violated Title VII when it revoked offers to Mss. Burns and Ruell to go on details after they complained about perceived discrimination. Thus, I will deny summary judgment as to their retaliation claims. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

September 16, 2024